Case No. 24-50956

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

MELISSA HICKSON, INDIVIDUALLY AND AS THE INDEPENDENT
ADMINISTRATOR OF THE ESTATE OF MICHAEL HICKSON, DECEASED
AND AS NEXT FRIEND OF M.H, M.H. AND M.H. (ALL MINORS);
MARQUES HICKSON,
*Plaintiffs/Appellants,*

*v.*

ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P., L.L.P.; DR. DEVRY
ANDERSON; HOSPITAL INTERNISTS OF TEXAS; CARLYE MABRY
CANTU; VIET VO,
*Defendants/Appellees.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
No. 1:21-CV-514
Honorable Alan D. Albright, District Court Judge

## BRIEF OF DISABILITY RIGHTS EDUCATION
## AND DEFENSE FUND AND OTHER
## DISABILITY RIGHTS ORGANIZATIONS AS
## AMICI CURIAE IN SUPPORT OF APPELLANTS

Claudia Center*; Jinny Kim; Ayesha Lewis; Erin Neff
Disability Rights Education and Defense Fund
3075 Adeline Street, Suite 210, Berkeley, CA 94703
Ph: 510-644-2555
ccenter@dredf.org; jkim@dredf.org; aelewis@dredf.org;
eneff@dredf.org
*Counsel of Record for Amici Curiae

# FULL LIST OF AMICI CURIAE

1. The Arc of the United States

2. The Autistic Self Advocacy Network

3. The Autistic Women & Nonbinary Network

4. Bazelon Center for Mental Health Law

5. Center for Public Representation

6. Coelho Center for Disability Law, Policy and Innovation

7. Deaf Equality

8. Disability Law United

9. Disability Rights Advocates

10. Disability Rights Education and Defense Fund

11. Disability Rights Legal Center

12. Disability Rights Mississippi

13. Disability Rights Washington

14. Institute for Patients' Rights

15. National Council on Independent Living

16. New Disabled South

17. Not Dead Yet

18. TASH

19. The National Association of the Deaf

20. The National Federation of the Blind

21. The National Health Law Program

22. The National Women's Law Center

23. United Spinal Association

24. World Institute on Disability

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26,1 and 29(a)(4)(A), amici through their counsel certify that they have no parent corporations nor any publicly held corporations owning 10% or more of their stock.

Dated: April 7, 2025         By: __/s/ Claudia Center_____

                                           Counsel of Record for Amici Curiae

# **TABLE OF CONTENTS**

FULL LIST OF AMICI CURIAE ......................................................... i

CORPORATE DISCLOSURE STATEMENT ..................................... ii

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS.................. viii

IDENTITY AND INTERESTS OF *AMICI*.........................................1

RULE 29(a)(4)(E) STATEMENT ............................................1

INTRODUCTION ....................................................................1

ARGUMENT ..........................................................................3

   I.   People With Disabilities Face Harmful Discrimination in Healthcare. ..........3

     A.   There Is a Long History of Disability Discrimination in Healthcare and Medicine.........................................................................3

     B.   Anti-Disability Bias is Pervasive in Healthcare. ....................................5

     C.   Given Historical and Ongoing Discrimination in Healthcare, Patients with Disabilities and Particularly Black Disabled Patients Experience Worse Health Outcomes. .............................................................11

   II.   Section 504 Prohibits Disability Discrimination in Medical Decision-Making.........................................................................14

   III.   Denying Medical Treatment Because of Disability Violates Section 504. 22

CONCLUSION ....................................................................26

STATEMENTS OF INTEREST OF AMICI CURIAE.........................................28

CERTIFICATE OF SERVICE ..............................................42

CERTIFICATE OF COMPLIANCE ........................................43

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Alexander v. Choate,*
  469 U.S. 287 (1985) ................................................................ 17, 22

*Bowen v. Am. Hosp. Assoc.,*
  476 U.S. 610 (1986) ................................................................ 22, 23

*Bragdon v. Abbott,*
  524 U.S. 624 (1998) .....................................................................15

*Buchanan v. Maine,*
  469 F.3d 158 (1st Cir. 2006) .......................................................16

*Buck v. Bell,*
  274 U.S. 200 (1927) .......................................................................3

*City of Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) .............................................................. 4, 5, 26

*Consol. Rail Corp. v. Darrone,*
  465 U.S. 624 (1984) .....................................................................17

*Estate of Ellen Alcade v. Deaton Specialty Hosp. Home, Inc.,*
  133 F. Supp. 2d 702 (D. Md. 2001) ............................................26

*Green v. City of New York,*
  465 F.3d 65 (2nd Cir. 2006) ........................................................23

*Helen L. v. DiDario,*
  46 F.3d 325 (3d Cir. 1995) ..........................................................17

*Kim v. HCA Healthcare, Inc.,*
  No. 3:20-CV-154-S, 2021 U.S. Dist. LEXIS 21900
  (N.D. Tex. Nov. 12, 2021) ...........................................................15

*Loeffler v. Staten Island Univ. Hosp.,*
  582 F.3d 268 (2d Cir. 2009) ........................................................25

*Lopez v. Christus Santa Rosa Health Sys.*,
No. SA:20-CV-00297-OLG, 2023 U.S. Dist. LEXIS 242422
(W.D. Tex. July 10, 2023) ....................................................................24

*McGugan v. Aldana-Bernier*,
752 F.3d 224 (2nd Cir. 2014) ..............................................................15

*Parker v. William Beaumont Hosp.*,
2023 U.S. Dist. LEXIS 89925 (E.D. Mich. May 23, 2023) ......................... 24, 25

*Perez v. Drs. Hosp. at Renaissance, Ltd.*,
624 F. App'x 180 (5th Cir. 2015) .........................................................23

*School Bd. of Nassau County v. Arline*,
480 U.S. 273 (1987) ...........................................................................17

*Taylor v. Richmond State Supported Living Center*,
No. 4:11-3740, 2012 U.S. Dist. LEXIS 170190 (S.D. Tex. Nov. 30, 2012) .......24

*Trimble v. Millwood Hosp.,*
420 F. Supp 3d 550 (N.D. Tex. 2016) ....................................................24

*U.S. v. Baylor Univ. Med. Ctr.*,
736 F.2d 1039 (5th Cir. 1984) ...................................................... 14, 15

*U.S. v. University Hosp.*,
729 F.2d 144 (2nd Cir. 1984) ....................................................... 15, 23

*Zamora-Quezada v. Healthtexas Med. Grp.*,
34 F. Supp. 2d 433 (W.D. Tex. 1998) ...................................................15

**Statutes**

29 U.S.C. § 701 ....................................................................................14
29 U.S.C. § 794 ............................................................................ passim
Pub. L. No. 95-602, § 120, 92 Stat. 2955 (Nov. 6, 1978)........................17
Tex. Health & Safety Code Ann. § 166.046 ...........................................9

## Other Authorities

Alexandra Minna Stern, "Sterilized in the Name of Public Health," 95 Am. J. Pub. Health 1128 (July 2005) ........................................................................3

Anne Valentine, *et al*., "Pregnancy Intendedness Among Racial and Ethnically Minoritized Women with Disabilities" Journal of Women's Health (2024) .......13

Bo Chen & Donna Marie McNamara, "Disability Discrimination, Medical Rationing and COVID-19," 12 Asian Bioethics Review 511 (Sept. 2020) .........10

Brooke Dorsey Holliman, *et al*., "Disability Doesn't Discriminate: Health Inequities at the Intersection of Race and Disability," Frontiers in Rehabilitation Sciences" 2 (2023) ........................................................................ 12, 13

Carlson, *et al*., Devaluing People with Disabilities, 26-30 (2012) ...........................6

Disability Rights Texas, "New Crisis Care Guidelines Protect Older Adults, Disabled" (Jan. 14, 2021) .....................................................................10

Dulce Gonzalez, *et al*., "Four in Ten Adults with Disabilities Experienced Unfair Treatment in Health Care Settings, at Work, or When Applying for Public Benefits in 2022," Urban Institute 8 & Table 2 (Oct. 2023).................................9

Emmanuel Perrodin-Njoku, *et al*., "Health disparities among Black deaf and hard of hearing Americans as compared to Black hearing Americans, 101:2 Medicine (Jan. 2022) ......................................................................................13

Ferdinando L. Mirarchi, *et al.*, "TRIAD III: Nationwide Assessment of Living Wills and Do Not Resuscitate Orders," 42:5 J. Emer. Med. 511 (2012) .............10

H.R. Rep. No. 98-442 (Oct. 26, 1983)....................................................................15

Jessica L. Gleason, PhD, MPH, *et al*., "Risk of Adverse Maternal Outcomes in Pregnant Women With Disabilities," JAMA Network (Dec. 15, 2021)....... 11, 12

Joseph Shapiro, HHS Warns States Not To Put People With Disabilities At The Back Of The Line For Care," NPR (Mar. 28, 2020)............................................18

Lisa Iezzoni, *et al*., "Physicians' Perceptions Of People With Disability And Their Health Care," 40 Health Affairs 297 (2021) ....................................................6, 11

Liz Essley Whyte, State Policies May Send People With Disabilities to the Back of the Line for Ventilators, Ctr. for Pub. Integrity (Apr. 8, 2020) ...........................18

Mary Crossley, "Ending-Life Decisions: Some Disability Perspectives," 33 Ga. State Univ. L. Rev. 893 (2017) ............................................................................7

Melanie Gréaux, *et al*., "Health Equity for Persons with Disabilities: A Global Scoping Review on Barriers and Interventions in Healthcare Services," Int'l J. for Equity in Health 6 (2023) .................................................................... 7, 8, 11

Nat'l Council on Disability, Bioethics and Disability Report Series (2019) ............5

Natalie Chin, "The Structural Desexualization of Disability," 124 Colum. L. Rev. 1595 (2024)...................................................................................................4

National Human Genome Research Institute, Factsheet on Eugenics and Scientific Racism ...........................................................................................................3, 4

NCD, Medical Futility and Disability Bias, 35 (Nov. 20, 2019)...............................5

Nicole L. Novak PhD, et al., "Disproportionate Sterilization of Latinos Under California's Eugenic Sterilization Program, 1920–1945," 108 Am. J. Pub. Health 611 (May 2018) ...................................................................................................3

Paul A. Lombardo, "Medicine, Eugenics, and the Supreme Court: From Coercive Sterilization to Reproductive Freedom," 13 J. Contemp. Health L. & Pol'y 1 (1997)...........................................................................................................3, 4

Philip Fohlich, "Who Are the Disabled in Institutions?," SSA Bulletin (Oct. 1971)...........................................................................................................4

Robyn M. Powell, "Confronting Eugenics Means Finally Confronting Its Ableist Roots," 27 Wm. & Mary J. Race, Gender, & Soc. Just. 607 (2021)..................3, 4

Ruth S. Shim, "Dismantling Structural Racism in Psychiatry: A Path to Mental Health Equity," 178 Am. J of Psychiatry 7 (2021)...............................................14

S. Rep. No. 95-890 (May 15, 1978)..........................................................................17

Samantha Artiga, *et al*., "Survey on Racism, Discrimination and Health: Experiences and Impacts Across Racial and Ethnic Groups," KFF (2023).....8, 12

Silvia Yee, LL.B., M.A., *et al*., "Compounded Disparities: Health Equity at the Intersection of Disability, Race, and Ethnicity" 42 (National Academies, 2016)........................................................................ passim

Tara Lagu, *et al*., "'I Am Not The Doctor For You': Physicians' Attitudes About Caring For People With Disabilities," Volume 41, No. 10, Health Affairs 1387 (2022) ...................................................................7

The Arc, "HHS-OCR Complaints Re COVID-19 Medical Discrimination" (Mar. 23, 2020)........................................................................ 10, 19, 21

U.S. Dep't of Health & Human Servs., BULLETIN: Civil Rights, HIPAA, and the Coronavirus Disease 2019 (Mar. 28, 2020) ........................................................19

U.S. Dep't of Health and Human Servs., Office of Civil Rights, "FAQs for Healthcare Providers during the COVID-19 Public Health Emergency: Federal Civil Rights Protections for Individuals with Disabilities under Section 504 and Section 1557" (Feb. 2022)........................................................... 11, 21

Wendy L. Macias-Konstantopoulos, *et al*., "Race, Healthcare, and Health Disparities: A Critical Review and Recommendations for Advancing Health Equity," 24 Soc. Emergency Med. and Population Health 907 (2023) ...............12

Willi Horner-Johnson, *et al*., "Adverse perinatal outcomes among Black and Hispanic women with physical disabilities," 228:1 Am. J. of Obstetrics & Gyn. S411 (Jan. 2023)..................................................................................13

**Rules**

89 Fed. Reg. 40082 (May 24, 2024) ..................................................................22

**Regulations**

28 C.F.R. § 35.130 ..........................................................................................20

45 C.F.R. § 84.52 ............................................................................................17

45 C.F.R. § 84.56 ....................................................................................22

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons as described in the fourth sentence of 5th Circuit Rule 28.2.1 have an interest in the outcome of this appeal.

The Arc of the United States – Amicus Curiae

Autistic Self Advocacy Network – Amicus Curiae

The Autistic Women & Nonbinary Network – Amicus Curiae

Bazelon Center for Mental Health Law – Amicus Curiae

Center for Public Representation – Amicus Curiae

Coelho Center for Disability Law, Policy and Innovation – Amicus Curiae

Deaf Equality – Amicus Curiae

Disability Law United – Amicus Curiae

Disability Rights Advocates – Amicus Curiae

Disability Rights Education and Defense Fund – Amicus Curiae

Disability Rights Legal Center – Amicus Curiae

Disability Rights Mississippi – Amicus Curiae

Disability Rights Washington – Amicus Curiae

Institute for Patients' Rights – Amicus Curiae

National Council on Independent Living – Amicus Curiae

New Disabled South – Amicus Curiae

Not Dead Yet

TASH

The National Association of the Deaf – Amicus Curiae

The National Federation of the Blind – Amicus Curiae

The National Health Law Program – Amicus Curiae

The National Women's Law Center – Amicus Curiae

United Spinal Association – Amicus Curiae

World Institute on Disability – Amicus Curiae

Claudia Center – *Counsel of Record for Amici Curiae

Jinny Kim – Counsel for Amici Curiae

Ayesha Lewis – Counsel for Amici Curiae

Erin Neff – Counsel for Amici Curiae

# IDENTITY AND INTERESTS OF *AMICI*

*Amici* are non-profit disability rights organizations that support the robust enforcement of federal disability rights laws including Section 504 of the Rehabilitation Act. Their Statements of Interest are contained in an appendix following the brief.

# RULE 29(a)(4)(E) STATEMENT

The undersigned certifies that no party's counsel authored this brief in whole or in part, and that no party, party's counsel, or any other person other than *Amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief.

# INTRODUCTION

Mr. Hickson, a disabled Black man, died as the result of discriminatory medical practices that saw him as unworthy of care. Mr. Hickson had several disabilities as a result of cardiac arrest, including short term memory loss, vision loss, slow speech, and quadriplegia. ROA.38. He was admitted to St. David's Healthcare Partnership for acute respiratory illness due to pneumonia, urinary tract infection, sepsis, and suspected COVID-19. ROA.43. On arrival, he was assessed as having a 70-percent chance of survival. ROA.44; ROA.428. Nevertheless, Defendant Dr. Vo told his wife, "as of right now, his quality of life, he doesn't have much of one" ROA.52. Dr. Vo distinguished Mr. Hickson from other of his

patients who were being treated aggressively for COVID–19, stating, "his quality of life is different than theirs. They were walking, talking." *Id.* Defendants stopped providing lifesaving treatment. *Id*. Defendants in this case did not save Mr. Hickson's life because they thought his life, as a person with a disability, was not worth saving. This is discrimination. A nondisabled patient with a 70-percent chance of survival with treatment almost certainly would not have been denied care. People with disabilities, especially Black people with disabilities, are often subject to discrimination in the medical field which leads to worse health outcomes, and in the case of Mr. Hickson, death. Section 504 prohibits such discrimination.

The court below erred. Plaintiffs allege discriminatory comments, actions, and inactions by Defendants that resulted in Mr. Hickson's avoidable death. The complaint states a claim under Section 504. The district court's reasoning that "Plaintiffs' claims are not 'classic discrimination claims,' but rather medical malpractice claims which are not subject to the [Rehabilitation Act]," ROA.443; ROA.482, is unsupported by the language of Section 504, its purposes, its implementing regulations, caselaw, and agency guidance. The ruling below should be reversed.

**ARGUMENT**

## I.    People With Disabilities Face Harmful Discrimination in Healthcare.

### A.    There Is a Long History of Disability Discrimination in Healthcare and Medicine.

Our society has a shameful history of discrimination in healthcare and medicine against disabled people. For decades in the 20th century, more than thirty U.S. states implemented the pseudoscience of eugenics[1] by passing and enforcing laws requiring the forced institutionalization and sterilization of people with disabilities and others deemed genetically defective.[2] The origins of eugenic

---

[1] Eugenics is the false theory that humans can be improved through selective breeding. In the U.S., eugenicists encouraged the reproduction of those of "good stock" and sought to screen out those deemed biologically inferior through forced sterilization, marriage bans, segregation, and institutionalization. Paul A. Lombardo, "Medicine, Eugenics, and the Supreme Court: From Coercive Sterilization to Reproductive Freedom," 13 J. Contemp. Health L. & Pol'y 1 (1997), https://scholarship.law.edu/cgi/viewcontent.cgi?article=1381&context=jchlp; National Human Genome Research Institute, Factsheet on Eugenics and Scientific Racism, https://www.genome.gov/about-genomics/fact-sheets/Eugenics-and-Scientific-Racism; *see also Buck v. Bell*, 274 U.S. 200, 207 (1927).

[2] Lombardo, n.1, at 1-2; Factsheet on Eugenics and Scientific Racism, n.1; Robyn M. Powell, "Confronting Eugenics Means Finally Confronting Its Ableist Roots," 27 Wm. & Mary J. Race, Gender, & Soc. Just. 607, 612-15 (2021), https://scholarship.law.wm.edu/cgi/viewcontent.cgi?article=1553&context=wmjowl; Alexandra Minna Stern, "Sterilized in the Name of Public Health," 95 Am. J. Pub. Health 1128 (2005) (African Americans, about 1% of California's population, accounted for 4% of sterilizations under state law targeting "unfit" and "feebleminded"), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2004.041608; Nicole L. Novak PhD, et al., "Disproportionate Sterilization of Latinos Under California's Eugenic Sterilization Program, 1920–1945," 108 Am. J. Pub. Health 611 (2018) (eugenic sterilization laws were disproportionately applied to Latina and Latino patients), https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2018.304369.

thought were rooted in ableism[3] and racism. Eugenic laws and policies targeted

disabled people, immigrants, Black people, and people living in poverty.[4]

Physicians were the most influential advocates in the eugenics movement, and

lobbied for laws that reflected eugenic theory and then defended those laws in the

courts.[5] Eugenics laws and policies led to the institutionalization and segregation

of hundreds of thousands of people, and the involuntary sterilization of 60,000 or

more.[6]

In their concurrence in *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S.

432 (1985), Justice Stevens and Chief Justice Burger noted the "history of unfair

and often grotesque mistreatment" borne out of "prejudice and ignorance" that was

imposed upon disabled children and adults. *Id.* at 454. The majority opinion cited

the role of "leading medical authorities" in this history:

> Fueled by the rising tide of Social Darwinism, the "science" of
> eugenics, and the extreme xenophobia of those years, leading medical
> authorities and others began to portray the "feebleminded" as a
> menace to society and civilization … responsible in large degree for

---

[3] One scholar defines ableism as "oppression faced due to disability/impairment (perceived or lived), which not only signals disability as a form of difference but constructs it as inferior." Natalie Chin, "The Structural Desexualization of Disability," 124 Colum. L. Rev. 1595, 1635 n 232 (2024).

[4] Factsheet on Eugenics and Scientific Racism, n.1; Powell, n.2, at 612-13.

[5] Lombardo, n.1, at 2.

[6] Philip Fohlich, "Who Are the Disabled in Institutions?," SSA Bulletin (1971), https://www.ssa.gov/policy/docs/ssb/v34n10/v34n10p3.pdf; Factsheet on Eugenics and Scientific Racism, n.1.

many if not all of our social problems. A regime of state-mandated segregation and degradation soon emerged … Massive custodial institutions were built to warehouse [people with intellectual disabilities] for life; the aim was to halt [their] reproduction[.] … [Children with intellectual disabilities] were categorically excluded from public schools, based on the false stereotype that all were ineducable and on the purported need to protect [nondisabled] children from them.

*Id.* at 461-63. Section 504 was enacted to remedy these forms of discrimination. Construing the law in the crabbed way of the decision below prevents the remediation of discrimination intended by Congress.

    B.    <u>Anti-Disability Bias is Pervasive in Healthcare</u>.

Many disabled people are denied medically necessary treatment because of deeply entrenched bias in the medical profession regarding the quality of life and inherent worth of people with disabilities. The National Council on Disability has reported how people with disabilities are impacted by bias in critical healthcare areas including determinations of medical futility that include perceived quality of life.[7] The Council explains: "Considering how pervasive disability biases are within the medical profession, it is easy to see how a deadly form of disability discrimination can result under this model."[8] Protection and advocacy agencies

---

[7] NCD, Bioethics and Disability Report Series (2019), https://www.ncd.gov/report/bioethics-and-disability-report-series/.

[8] NCD, Medical Futility and Disability Bias, 35 (2019), https://www.ncd.gov/report/medical-futility-and-disability-bias/.

have documented situations where individuals with disabilities have had basic life sustaining treatment withheld from them that would not be contemplated by the medical community for individuals without disabilities.[9]

The pervasiveness of anti-disability bias in healthcare cannot be overstated. Studies have consistently demonstrated that doctors and other healthcare providers hold negative views of people with disabilities and fail to fully appreciate the value and quality of life with a disability.[10] For example, a 2021 survey found that negative perceptions of patients with disabilities were widespread among physicians – to a degree researchers described as "disturbing."[11] Of over 700 practicing US physicians surveyed, 82.4 percent reported that people with significant disability have worse quality of life than nondisabled people,[12] affirming prior research demonstrating healthcare providers' negative beliefs about

---

[9] Carlson, *et al*., Devaluing People with Disabilities, 26-30 (2012) (collecting stories of people with disabilities denied lifesaving medical treatment), https://www.ndrn.org/wp-content/uploads/2012/05/Devaluing-People-with-Disabilities.pdf; *see also* Silvia Yee, LL.B., M.A., *et al*., "Compounded Disparities: Health Equity at the Intersection of Disability, Race, and Ethnicity" 42 (National Academies, 2016), https://www.nationalacademies.org/our-work/the-intersections-between-health-disparities-disabilities-and-health-equity-a-workshop#resources.

[10] Yee, n.9, at 40-42 (collecting and describing studies showing negative attitudes by doctors, medical students, nurses, and nursing students towards disability, including view that life would not be worth living following paralyzing injury).

[11] Lisa Iezzoni, *et al*., "Physicians' Perceptions Of People With Disability And Their Health Care," 40 Health Affairs 297, 301 (2021), https://www.healthaffairs.org/doi/epdf/10.1377/hlthaff.2020.01452.

[12] *Id.*

the low quality of life of persons with significant disabilities.[13]

In a similar study, published in 2022, participating physicians revealed an array of negative attitudes about people with disabilities.[14] Many expressed explicit bias toward people with disabilities and described strategies for discharging them from their practices.[15] Many indicated that providing accommodations to disabled patients was burdensome, and one described disabled people as "an entitled population."[16] Some described care that they would have provided if a patient did not have a disability, confirming their disparate treatment.[17] A 2023 literature review identified dozens of articles finding discriminatory attitudes and behaviors by healthcare professionals towards disabled patients across services, regions, and levels of income.[18] Examples included refusals to provide care, negative

---

[13] *See, e.g.*, Mary Crossley, "Ending-Life Decisions: Some Disability Perspectives," 33 Ga. State Univ. L. Rev. 893, 900–01 (2017) (reviewing studies), https://readingroom.law.gsu.edu/cgi/viewcontent.cgi?article=2897&context=gsulr.

[14] Tara Lagu, *et al*., "'I Am Not The Doctor For You': Physicians' Attitudes About Caring For People With Disabilities," Volume 41, No. 10, Health Affairs 1387 (2022), https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.00475.

[15] *Id*. at 1392.

[16] *Id.*

[17] *Id.*

[18] Melanie Gréaux, *et al*., "Health Equity for Persons with Disabilities: A Global Scoping Review on Barriers and Interventions in Healthcare Services," Int'l J. for Equity in Health 6 (2023), https://equityhealthj.biomedcentral.com/articles/10.1186/s12939-023-02035-w.

assumptions about the capacity of disabled people to engage in their own care, and disrespect for disabled patients' wishes regarding care.[19] These negative attitudes hinder access to healthcare services for patients with disabilities.

A disabled patient who is Black may face not only disability bias but also bias based on race. Studies have identified racial bias in doctors, medical students, residents, nurses, and nursing students.[20] Research shows that during clinical interactions with Black patients, doctors provide less information, spend less time, are more verbally aggressive, and less supportive.[21] Black patients are more likely than white patients to report that their healthcare provider did not involve them in decision-making about their care.[22] About one in five Black adults (18%) report that they have been treated unfairly or with disrespect by a healthcare provider in the past three years because of their race, compared to only three percent of white adults.[23] These higher rates of poor treatment have implications for health and well-being.

---

[19] *Id.*

[20] Yee, n.9, at 39 (collecting studies).

[21] *Id.*

[22] *Id.*

[23] Samantha Artiga, *et al.*, "Survey on Racism, Discrimination and Health: Experiences and Impacts Across Racial and Ethnic Groups," KFF (2023), https://www.kff.org/racial-equity-and-health-policy/poll-finding/survey-on-racism-discrimination-and-health/.

While the literature on bias faced by Black disabled patients is relatively thin, it stands to reason that these patients experience intensified harms. A recent study showed that, among disabled adults, Black adults are more likely than white adults to report unfair treatment in healthcare settings.[24] Focus groups conducted with disabled people of color suggest that these individuals confront barriers to care associated with race and ethnicity as well as disability. Participants described encountering stereotypes related to their race and ethnicity, as well as physical and attitudinal barriers and lack of necessary clinical knowledge related to their disability.[25]

Given this context, it is not an exaggeration to say that disabled patients, and especially Black disabled patients, are at disproportionately high risk of being killed as the result of medical bias and the barriers it creates. State laws allow physicians and hospitals to discontinue life-sustaining care they believe to be futile even if a patient or patient's family desires to continue treatment.[26] Studies show

---

[24] Dulce Gonzalez, *et al*., "Four in Ten Adults with Disabilities Experienced Unfair Treatment in Health Care Settings, at Work, or When Applying for Public Benefits in 2022," Urban Institute 8 & Table 2 (2023), https://www.urban.org/research/publication/four-ten-adults-disabilities-experienced-unfair-treatment-health-care-settings.

[25] Yee, n.9, at 73-74.

[26] *See, e.g.*, Tex. Health & Safety Code Ann. § 166.046. The determination must be reviewed by an ethics committee that "may not make any judgment on the patient's quality of life." *Id.*

that most physicians misinterpret a living will as synonymous with a "do not resuscitate" (DNR) order, and over-interpret DNR orders as meaning "comfort care" or "end-of-life" care only, when such orders may coexist with the patient receiving aggressive treatments.[27] During the first year of the COVID-19 pandemic, disabled patients faced "crisis standards of care" – rules for rationing scarce health resources – that explicitly discriminated on the basis of disability, instead of the question of whether care would allow the person to survive.[28] In contrast to the ruling below in this case, the U.S. Department of Health and Human Services found – consistent with statutory language, Congressional intent, regulations, and caselaw – that Section 504 applied to the medical judgments exercised during the first years of the pandemic, including those contained in crisis standards of care.[29]

---

[27] Ferdinando L. Mirarchi, *et al.*, "TRIAD III: Nationwide Assessment of Living Wills and Do Not Resuscitate Orders," 42:5 J. Emer. Med. 511 (2012), https://www.jem-journal.com/article/S0736-4679(11)00853-5/fulltext.

[28] Bo Chen & Donna Marie McNamara, "Disability Discrimination, Medical Rationing and COVID-19," 12 Asian Bioethics Review 511 (2020); Disability Rights Texas, "New Crisis Care Guidelines Protect Older Adults, Disabled" (2021), https://disabilityrightstx.org/en/press_release/texas-crisis-care-guidelines/.

[29] The Arc, "HHS-OCR Complaints Re COVID-19 Medical Discrimination" (2020) (collecting HHS OCR complaints, HHS OCR resolutions, and HHS OCR guidance documents), https://thearc.org/resource/hhs-ocr-complaint-of-disability-rights-washington-self-advocates-in-leadership-the-arc-of-the-united-states-and-ivanova-smith/; U.S. Dep't of Health and Human Servs., Office of Civil Rights, "FAQs for Healthcare Providers during the COVID-19 Public Health Emergency: Federal Civil Rights Protections for Individuals with Disabilities under

C.   Given Historical and Ongoing Discrimination in Healthcare, Patients with Disabilities and Particularly Black Disabled Patients Experience Worse Health Outcomes.

Persons with disabilities experience health inequities in terms of increased mortality, morbidity, and limitations in functioning when compared to the rest of the population. Many of the poor health outcomes cannot be explained by the underlying health condition or impairment, but are health inequities driven by unfair societal and health system factors.[30] Disabled patients experience disparate health outcomes across several areas, including preventive care, cancer diagnosis and treatment, diabetes, cardiovascular disease, and reproductive and pregnancy care.[31] Pregnant patients with physical, intellectual, and sensory disabilities face a "significantly higher risk of almost all adverse maternal outcomes" and are eleven times more likely to die during childbirth than non-disabled patients.[32] Research shows that discriminatory and erroneous views of disabled people lead to the failure to provide necessary care such as breast and cervical cancer screening,

Section 504 and Section 1557" (2022), https://www.hhs.gov/civil-rights/for-providers/civil-rights-covid19/disabilty-faqs/index.html.

[30] Gréaux, n.18, at 1-2; Iezzoni, n.11, at 303; Yee, n.9, at 32.

[31] Gréaux, n.18, at 1-2; Yee, n.9, at 32.

[32] Jessica L. Gleason, PhD, MPH, et al., "Risk of Adverse Maternal Outcomes in Pregnant Women With Disabilities," JAMA Network (2021), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2787181.

breast cancer treatment, and sexual health resources.[33]

Black people experience severe disparities in health and life outcomes that are rooted in historic and present-day discrimination.[34] Black Americans experience significantly shorter life expectancies than white Americans.[35] Studies show that, compared to white patients, Black patients experience disparate health outcomes across many areas, including communicable diseases, noncommunicable conditions, and injuries.[36] At emergency departments, compared to white patients, Black patients have longer wait times, lower triage acuity levels, and higher odds of death. Research suggests that stereotyping and racial bias by physicians and clinical staff contribute to healthcare disparities.[37]

Studies show that Black patients with disabilities and other disabled people of color experience even greater health disparities.[38] Black and Hispanic adults

---

[33] *Id.*; Yee, n.9, at 44.

[34] Artiga, n.23; Yee, n.9, at 37.

[35] Artiga, n.23.

[36] Wendy L. Macias-Konstantopoulos, *et al.*, "Race, Healthcare, and Health Disparities: A Critical Review and Recommendations for Advancing Health Equity," 24 Soc. Emergency Med. and Population Health 907 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10527840/pdf/wjem-24-906.pdf.

[37] Macias-Konstantopoulos, n.36, at 907; Yee, n.9, at 38-39.

[38] Brooke Dorsey Holliman, *et al*., "Disability Doesn't Discriminate: Health Inequities at the Intersection of Race and Disability," Frontiers in Rehabilitation Sciences" 2 (2023),

with disabilities experience greater disparities in access to healthcare than Black and Hispanic adults without disabilities.[39] People with intellectual and developmental disabilities from racially and ethnically marginalized communities have worse health and healthcare outcomes compared to their white counterparts with similar disabilities.[40] Black adults who are deaf and hard of hearing have a higher likelihood for diabetes, hypertension, lung disease, cancer, and comorbidity compared to their hearing Black counterparts.[41] Women with physical disabilities are more likely to have adverse perinatal outcomes than women without disabilities, but the likelihood is highest for Black disabled women.[42] People of color with mental health and substance use disorders disproportionately experience

---

https://www.frontiersin.org/journals/rehabilitation-sciences/articles/10.3389/fresc.2023.1075775/full; Yee, n.9, at 69-72.

[39] Holliman, n.38, at 2.

[40] Holliman, n.38, at 2; Yee, n.9, at 70.

[41] Emmanuel Perrodin-Njoku, *et al*., "Health disparities among Black deaf and hard of hearing Americans as compared to Black hearing Americans, 101:2 Medicine (Baltimore) (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC8757936/.

[42] Willi Horner-Johnson, *et al*., "Adverse perinatal outcomes among Black and Hispanic women with physical disabilities," 228:1 Am. J. of Obstetrics & Gyn. S411 (2023), https://www.ajog.org/article/S0002-9378(22)01600-3/fulltext; *see also* Anne Valentine, *et al*., "Pregnancy Intendedness Among Racial and Ethnically Minoritized Women with Disabilities" Journal of Women's Health (2024).

misdiagnosis, overdiagnosis, and poor treatment.[43] Mitigating these disparities requires that healthcare entities and providers comply with disability nondiscrimination requirements.

## II. Section 504 Prohibits Disability Discrimination in Medical Decision-Making.

Section 504 evidences Congress's recognition that legislation was necessary to ameliorate widespread discrimination, including in healthcare. Section 504 establishes that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Inpatient and emergency room services are among the benefits provided by a healthcare "program or activity." *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1042 (5th Cir. 1984). Covered programs include the "entire corporation, partnership, or other private organization … which is principally engaged in the business of providing … health care[.]" 29 U.S.C. § 794(b)(3)(A)(ii); *see also* 29 U.S.C. § 701(a)(5) (Congressional finding that "individuals with disabilities continually encounter various forms of discrimination

---

[43] Ruth S. Shim, "Dismantling Structural Racism in Psychiatry: A Path to Mental Health Equity," 178 Am. J of Psychiatry 7 (2021).

in such critical areas as … health services"). Under the plain terms of Section 504, a disabled person is entitled to receive medical services from a covered program without discrimination.[44]

The Supreme Court has recognized that disability discrimination laws apply to medical treatment. In *Bragdon v. Abbott,* the Supreme Court held that a dentist's policy against filling cavities of patients with HIV would violate the ADA unless it could be justified by an individualized "risk assessment … based on medical or other objective evidence." 524 U.S. 624, 649 (1998). The Court made clear that the dentist "receives no special deference simply because he is a health care provider." *Id.* Federal courts also hold that a plaintiff can bring a disability discrimination claim if the plaintiff's disability, as was the case here, is "unrelated to [the] medical treatment decisions" at issue. *Kim v. HCA Healthcare, Inc.*, No. 3:20-CV-154-S, 2021 U.S. Dist. LEXIS 21900, at *9 (N.D. Tex. Nov. 12, 2021).[45]

---

[44] *Cf. Baylor Univ. Med. Ctr.*, 736 F.2d at 1045 ("Our conclusion that Congress intended Medicare and Medicaid to constitute 'federal financial assistance' for the purposes of Section 504 is strengthened by a recent House Committee report: … 'The Committee wishes to reaffirm that health care facilities and other providers that receive Medicare and Medicaid funds are required, under existing statutes and long-standing Department of Health and Human Services regulations and interpretations, to provide services without discrimination.'") (citing H.R. Rep. No. 98-442, pt. 1, at 77 (Oct. 26, 1983)); *Zamora-Quezada v. Healthtexas Med. Grp.*, 34 F. Supp. 2d 433, 440 (W.D. Tex. 1998) (quoting *Baylor*, 736 F.2d 1039).

[45] *See also McGugan v. Aldana-Bernier*, 752 F.3d 224 (2nd Cir. 2014) (finding that a plaintiff can bring a Section 504 claim against "a doctor who inflicts or withholds a type of medical treatment for reasons having no relevance to medical appropriateness – reasons dictated by bias rather than medical knowledge.")' *U.S. v. University Hosp.*, 729 F.2d 144, 156 (2nd Cir. 1984) ("Section 504 prohibits discrimination" where the "individual's disability is unrelated to, and

Regulations developed and finalized with the review and participation of Congress make clear that Section 504 prohibits all forms of disability discrimination by covered entities. Discrimination is prohibited whether it is the result, as alleged here, of individual animus and bias, or the result of policies and practices that cause discrimination directly or indirectly:

> In providing health, welfare, or other social services or benefits, a recipient may not, on the basis of [disability]: (1) Deny a qualified person with a disability these benefits or services; (2) Afford a qualified person with a disability an opportunity to receive benefits or services that is not equal to that offered persons without disabilities; (3) Provide a qualified person with a disability with benefits or services that are not as effective … as the benefits or services provided to others; … or (5) Provide different or separate benefits or services to persons with disabilities except where necessary to provide qualified persons with disabilities with benefits and services that are as effective as those provided to others. …

> No qualified individual with a disability shall, solely on the basis of disability, be excluded from participation in or be denied the benefits of the programs or activities of a recipient, or be subjected to discrimination by any recipient. …

> A recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service. …

---

thus improper to consideration of, the services in question"); *Buchanan v. Maine*, 469 F.3d 158, 176 (1st Cir. 2006) (holding that a plaintiff can challenge medical decisions under Section 504 if "framed within a larger theory of disability discrimination.").

A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration—(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability[.]

45 C.F.R. §§ 84.52, 84.68(a), (b)(1), (3).[46] The regulations prohibit the type of discrimination alleged here: that the defendants denied beneficial medical treatment to Mr. Hickson based on a belief that Mr. Hickson's disabilities diminished the quality and value of his life, that his life was not worth living, and that therefore Mr. Hickson was not worth treating.

Defendants' position that their actions and inactions based on medical judgment are immunized from disability discrimination claims brought under Section 504 should be rejected. As detailed herein, discrimination in the provision

---

[46] The regulations, finalized with the participation and review of Congress, and then ratified through reenactment, have the force of law. Pub. L. No. 95-602, § 120, 92 Stat. 2955 (Nov. 6, 1978) (first of four times that Section 504 was reenacted following regulations); *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 635 nn.15 & 16 (1984) ("The regulations particularly merit deference in the present case: the responsible congressional Committees participated in their formulation, and both these Committees and Congress itself endorsed the regulations in their final form. … In adopting § 505(a)(2) in the amendments of 1978, Congress incorporated the substance of the Department's regulations into the statute.") (citing S. Rep. No. 95-890 (May 15, 1978)); *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 279 (1987) ("As we have previously recognized, these regulations were drafted with the oversight and approval of Congress; they provide 'an important source of guidance on the meaning of § 504.'") (citing *Darrone*, 465 U.S. at 634-635 & nn. 14-16 (1984)); *Alexander v. Choate*, 469 U.S. 287, 304 n. 24 (1985) ("We have previously recognized these regulations as an important source of guidance on the meaning of § 504."); *accord Helen L. v DiDario*, 46 F.3d 325, 332 (3d Cir. 1995) ("When Congress re-enacts a statute and voices its approval of an administrative interpretation of that statute, that interpretation acquires the force of law and courts are bound by the regulation."). The "will of Congress" is clear. *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024).

17

of medical services remains a rampant and a recurrent experience for people with disabilities, and particularly for people with significant disabilities. Physicians and other providers hold negative views about disabled people and have limited understanding of the value and quality of life with a disability.[47] Healthcare rationing systems in response to the COVID-19 pandemic deprioritized people with disabilities for ventilators and other critical care based on factors unrelated to their ability to benefit from treatment, such as their need for assistance with activities of daily living.[48]

In response to disability discrimination during the first months of the pandemic, including explicit disability discrimination in medical rationing rules, the U.S. Department of Health and Human Services (HHS) took a leadership role under its Section 504 authority.[49] The Department issued a bulletin stating:

> The Office for Civil Rights enforces Section 1557 of the Affordable Care Act and Section 504 of the Rehabilitation Act which prohibit discrimination on the basis of disability in HHS funded health

---

[47] *See* nn.1-19.

[48] Liz Essley Whyte, State Policies May Send People With Disabilities to the Back of the Line for Ventilators, Ctr. for Pub. Integrity (Apr. 8, 2020), https://publicintegrity.org/health/coronavirus-and-inequality/state-policies-may-send-people-with-disabilities-to-the-back-of-the-line-for-ventilators/.

[49] Roger Severino, then director of the Department's Office of Civil Rights, explained: "We're concerned that stereotypes about what life is like living with a disability can be improperly used to exclude people from needed care." Joseph Shapiro, HHS Warns States Not To Put People With Disabilities At The Back Of The Line For Care," NPR (Mar. 28, 2020), https://www.npr.org/2020/03/28/823254597/hhs-warns-states-not-to-put-people-with-disabilities-at-the-back-of-the-line-for.

programs or activities. These laws, like other civil rights statutes OCR enforces, remain in effect. As such, persons with disabilities should not be denied medical care on the basis of stereotypes, assessments of quality of life, or judgments about a person's relative "worth" based on the presence or absence of disabilities. Decisions by covered entities concerning whether an individual is a candidate for treatment should be based on an individualized assessment of the patient based on the best available objective medical evidence.

"Civil Rights, HIPAA, and the Coronavirus Disease 2019 (COVID-19)" (Mar. 28, 2020).[50] As it is charged to do, the Department accepted complaints of discrimination in healthcare and supervised conciliation agreements under Section 504. These agreements revised crisis standards of care documents to focus on the predicted effectiveness of treatment to allow the patient to survive rather than longer term life expectancy or quality of life.[51]

The Department issued a guidance document about how Section 504 applies to medical decision making under applicable Crisis Standards of Care, explaining that nondiscriminatory care decisions should focus on whether life-saving care would be effective to allow the patient to survive and be discharged from the hospital. The guidance emphasizes that the patient's preexisting disability should not be a basis for denying care, unless the condition is so severe that it would

---

[50] Now available at https://www.justice.gov/crt/media/1060066/dl?inline.

[51] The Arc, n.29.

prevent the patient from surviving through discharge from the hospital or shortly

thereafter. It also notes that critical care providers are not likely to have expertise

concerning the impact of existing disabilities upon survival. The guidance states:

> When allocating scarce resources or care in a public health
> emergency, covered entities must analyze the specific patient's *ability*
> *to benefit from the treatment sought*, free from stereotypes and bias
> about disability, including prejudicial preconceptions and assessments
> of quality of life, or judgments about a person's relative "worth"
> based on the presence or absence of disabilities.

> By 'bias,' OCR is referring to an unfavorable perception based on
> prejudice, assumptions, conclusions or beliefs about an individual or
> group of individuals with a specific disability or any disability that is
> not supported by current medical knowledge or the best available
> objective evidence. Use of assessment tools or factors for making
> resource allocation decisions that screen out or tend to screen out
> individuals with disabilities or any class of individuals with
> disabilities from fully and equally enjoying any healthcare service,
> program, or activity being offered, unless such criteria can be shown
> to be necessary for the provision of the service, program or activity
> being offered, would violate nondiscrimination laws. 28 C.F.R. §
> 35.130(b)(8). …

> While covered entities may rely upon applicable Crisis Standards of
> Care in making resource allocation decisions that affect individuals
> with disabilities, those standards should be based on *current medical*
> *knowledge or the best available objective evidence regarding*
> *effectiveness of treatment*. To avoid disability discrimination, Crisis
> Standards of Care should be applied in a way that assesses *whether*
> *the treatment sought is likely to be effective for each individual*
> *patient*. Hospitals may, however, deny care during a public health
> emergency on the basis that such care is unlikely to be effective for a
> particular patient, after analyzing that patient's ability to respond to
> the treatment being sought. The patient's pre-existing disability or
> diagnosis should not form the basis for decisions regarding the
> allocation of scarce treatment, unless that underlying condition is so
> severe that it would prevent the treatment sought from being effective

or would prevent the patient from surviving until discharge from the hospital or shortly thereafter. Further, when mortality predictions are based on a patient's underlying disability, and not the condition for which they need immediate care, the less grounded in objective medical evidence they are likely to be, as *critical care providers are not likely to have expertise concerning the life expectancy of every underlying condition patients have.*

HHS, Office of Civil Rights, "FAQs for Healthcare Providers during the COVID-19 Public Health Emergency: Federal Civil Rights Protections for Individuals with Disabilities under Section 504 and Section 1557" (Feb. 2022) (citation omitted, emphases added).[52]

The updated Section 504 rules finalized by HHS in May 2024 reaffirm well-established law and the Department's long-standing interpretation across Administrations that the type of discrimination alleged here is prohibited by Section 504. The updated rules contain specific language applying the Act to medical treatment decisions, consistent with prior guidance:

> No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in medical treatment under any program or activity that receives Federal financial assistance, including in the allocation or withdrawal of any good, benefit, or service. …
>
> A recipient may not deny or limit medical treatment to a qualified individual with a disability when the denial is based on: (i) Bias or stereotypes about a patient's disability; (ii) Judgments that the individual will be a burden on others due to their disability, including,

---

[52] *See* n.29.

but not limited to caregivers, family, or society; or (iii) A belief that the life of a person with a disability has lesser value than the life of a person without a disability, or that life with a disability is not worth living. …

Where a qualified individual with a disability or their authorized representative seeks or consents to treatment for a separately diagnosable symptom or medical condition (whether or not that symptom or condition is a disability under this part or is causally connected to the individual's underlying disability), a recipient may not deny or limit clinically appropriate treatment if it would be offered to a similarly situated individual without an underlying disability.

45 C.F.R. § 84.56(a), (b)(1), (2); *see also id.* at (c) (delineating role of professional

judgment and consent in medical treatment).[53]

## III.   Denying Medical Treatment Because of Disability Violates Section 504.

Congress recognized the parallel histories of discrimination based on race,

color, national origin, sex and disability, and based Section 504 of the

Rehabilitation Act of 1973 on Title VI of the Civil Rights Act of 1964 and Title IX

of the Education Amendments of 1972. There is no question that patients of color

---

[53] By describing and giving examples of discrimination in medical treatment, while incorporating the role of consent and medical judgment, the updated rules avoid the prescriptive outcome-oriented approach rejected by the Supreme Court in *Bowen v. Am. Hosp. Assoc.*, 476 U.S. 610, 622, 637-647 (1986); *accord* 89 Fed. Reg. 40082 (May 24, 2024) ("Commenters expressed broad support for the medical treatment section, with many expressing particular support for the general prohibition against discrimination. Many people with disabilities shared experiences regarding the inappropriate denial of medical treatment, while many provider organizations expressed appreciation for the regulatory clarity and respect for professional judgment in the proposed provision."); *see also Bowen*, 476 U.S. at 624 ("It follows, under our decision in *Alexander v. Choate*, 469 U.S. 287, 301 (1985), that handicapped infants are entitled to "meaningful access" to medical services provided by hospitals, and that a hospital rule or state policy denying or limiting such access would be subject to challenge under § 504.").

are entitled to the application of the same medical standards as are applied to their white counterparts. If a Black patient and a white patient present the same treatable condition, we expect the healthcare facility to provide the same treatment for one as is provided for the other. The same is true if male and female newborns present the same treatable conditions. Similarly, a person with a disability should not be subjected to a different standard of medical care because of disability.[54] Medical judgment can be influenced and distorted by discriminatory bias and should not be shielded from judicial scrutiny.

Courts have allowed disability discrimination claims against hospitals for conduct associated with medical treatment decisions. *See*, *e.g.*, *Green v. City of New York*, 465 F.3d 65, 78 (2nd Cir. 2006) (overturning summary judgment for hospital because a reasonable jury could find that supervisor "adopted a stereotyped view of [plaintiff's] abilities and therefore discriminated"); *Perez v. Drs. Hosp. at Renaissance, Ltd.*, 624 F. App'x 180 (5th Cir. 2015) (reversing summary judgment for hospital because failure to provide interpreter to deaf

---

[54] *Cf. Bowen v. Am. Hosp. Assoc.*, 476 U.S. 610, 623 (1986) (summarizing dissent in *University Hospital*: "Judge Winter dissented. He pointed out that § 504 was patterned after § 601 of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race in federally funded programs, and asserted that a refusal to provide medical treatment because of a person's handicapping condition is as clearly covered by § 504 as a refusal based on a person's race is covered by § 601: 'A judgment not to perform certain surgery because a person is black is not a bona fide medical judgment. So too, a decision not to correct a life threatening digestive problem because an infant has Down's Syndrome is not a bona fide medical judgment.'").

parents stated claims of discrimination); *Taylor v. Richmond State Supported Living Center*, No. 4:11-3740, 2012 U.S. Dist. LEXIS 170190, at *18 (S.D. Tex. Nov. 30, 2012) (denying motion to dismiss ADA and Section 504 claims where complaint alleged that mistreatment was "'because of' his disabilities"). Hospitals and healthcare providers do not get a pass to discriminate by asserting that their decisions are due to medical judgment or within the context of medical treatment.

There is no conflict between claims for medical malpractice and claims for disability discrimination. The same set of facts can support both types of claims. In *Lopez v. Christus Santa Rosa Health Sys.,* the Western District of Texas denied a motion to dismiss and rejected the hospital's assertions that its actions were "medical treatment decisions." *Lopez v. Christus Santa Rosa Health Sys*., No. SA:20-CV-00297-OLG, 2023 U.S. Dist. LEXIS 242422, at *11 (W.D. Tex. July 10, 2023). The court held that "the core allegations in the complaint relat[e] directly to the elements of disability-based discrimination claims under Section 504," and allowed the Section 504 claim to move forward alongside the plaintiff's claim for medical negligence. *Id.*; *see also Trimble v. Millwood Hosp.,* 420 F. Supp 3d 550 (N.D. Tex. 2016) (analyzing separately Section 504 claim and medical malpractice claim for patient who was involuntarily committed to inpatient care).

In *Parker v. William Beaumont Hosp.*, 2023 U.S. Dist. LEXIS 89925 (E.D. Mich. May 23, 2023), the district court found triable issues of fact in a case

alleging medical malpractice and disability discrimination based on a failure to provide a deaf patient with a sign language interpreter. Lack of effective communication resulted in the patient being unable to communicate her symptoms, leading to an incorrect diagnosis and ultimately death. The court analyzed the "distinction between allegations of inadequate medical treatment and unlawful discrimination." *Id.* at *15. In denying the motion for summary judgment, the court found that "federal disability civil rights statutes require equal access to and equal opportunity to participate in their medical treatment" and concluded that the plaintiff's disability rights claims were "separate and distinct" and rest on claims of denial of "equal and meaningful access to medical care and treatment." *Id.* at *16, 25-26.

Similarly, in *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268 (2d Cir. 2009), the hospital failed to provide a sign language interpreter for a deaf patient and spouse forcing their minor children to interpret. In reversing the district court's grant of summary judgment on Section 504 and malpractice claims, the Second Circuit explained that the Section 504 claim was not one of inadequate treatment, but discriminatory denial of equal and meaningful access to medical services. *Loeffler,* 582 F.3d at 275; *see also Aikins v. St. Helena Hosp.*, 843 F. Supp. 1329, 1338 (N.D. Cal.1994) (recognizing that adequate medical treatment is not a defense to Section 504 claim that defendant failed to provide effective

communication); *Estate of Ellen Alcade v. Deaton Specialty Hosp. Home, Inc.*, 133 F. Supp. 2d 702, 709-10 (D. Md. 2001) (denying motion to dismiss Section 504 and medical malpractice claims where patient was provided no sign language interpreters during lengthy hospital stay during which a medical procedure was performed which ultimately led to death). Likewise here, the court below should have permitted the Section 504 claim to proceed.

Bias against people with disabilities is firmly embedded in the "history of unfair and often grotesque mistreatment" arising from the "prejudice and ignorance" acknowledged in *City of Cleburne*, 473 U.S. at 438. This Court must decide whether the complaint, alleging a refusal to treat based on stereotyped assumptions about patients with disabilities and their quality of life,[55] states a claim under federal law. Where medical treatment would benefit a patient and help them survive, refusal to provide it based on disability is rooted in prejudice and violates Section 504.

## CONCLUSION

A plaintiff may bring a Section 504 claim against a healthcare provider for withholding life-saving medical treatment for reasons dictated by bias rather than

---

[55] "[A]s of right now, his quality of life, he doesn't have much of one." ROA.52. He's not like other patients receiving treatment for COVID-19, because "his quality of life is different than theirs. They were walking, talking." *Id.*

objective medical evidence. Here, where plaintiffs allege that Mr. Hickson was denied beneficial medical treatment based on disability, his claims include not only medical malpractice but also unlawful disability discrimination. The district court's ruling on Section 504 should be reversed.

April 7, 2025                                        Respectfully Submitted,

/s/ _____

Claudia Center*
Jinny Kim
Ayesha Lewis
Erin Neff
Disability Rights Education and
Defense Fund
3075 Adeline Street Suite 210
Berkeley, CA 94703
Ph: 510-644-2555
ccenter@dredf.org

*Counsel of Record for Amici Curiae

## STATEMENTS OF INTEREST OF AMICI CURIAE

**The Arc of the United States** is a national community-based organization that works to uphold the access of every individual with intellectual and developmental disabilities to the information, advocacy, and skills needed to support full participation in the community.

**The Autistic Self Advocacy Network** is the nation's largest and oldest advocacy organization run by and for the autistic community. We advocate for the rights and wellbeing of autistic people and the broader intellectual and developmental disability community. People with IDD, particularly those who are also people of color, are frequent victims of life-threatening medical discrimination. For that reason, this matter is of great concern to us.

**The Autistic Women & Nonbinary Network (AWN)** provides community support, and resources for Autistic women, girls, transfeminine and transmasculine nonbinary people, trans people of all genders, Two Spirit people, and all people of marginalized genders or of no gender. AWN is committed to recognizing and celebrating diversity and the many intersectional experiences in our community. AWN's work includes solidarity aid, community events, publications, fiscal support, and advocacy to empower disabled and autistic people in their fight for disability, gender, and racial justice.

Since 1972, the Judge David L. **Bazelon Center for Mental Health Law**

has advocated for the civil rights, full inclusion, and equality of adults and children with mental health disabilities. The Bazelon Center was instrumental in the passage of the Americans with Disabilities Act and has extensive experience addressing disability discrimination in healthcare services, including the application of the Rehabilitation Act.

**The Center for Public Representation** ("CPR") is a national advocacy organization dedicated to enforcing and expanding the rights of people with disabilities and others who are in segregated settings. For more than 50 years, CPR has used legal strategies, advocacy, and policy to design and implement system reform initiatives that increase access to integrated community services for children and adults with disabilities. CPR provides technical assistance and support to a network of federally-funded protection and advocacy programs in each of the United States and U.S. territories. Many of these programs routinely advocate on behalf of adults and children with disabilities in the health care system. CPR has litigated systemic cases on behalf of people with disabilities in more than twenty jurisdictions. CPR has submitted amicus briefs to the United States Supreme Court and numerous courts of appeals in cases seeking to enforce the constitutional and statutory rights of persons with disabilities, including the right to be free from discrimination under the ADA and Section 504 of the Rehabilitation Act. During the pandemic, CPR worked to ensure that people with

disabilities, older adults, and communities of color have equal access to life-saving COVID-19 treatments. Together with other disability rights organizations around the country, CPR filed complaints with the U.S. Department of Health and Human Services' Office of Civil Rights (OCR) regarding: 1) discriminatory treatment rationing protocols, often known as Crisis Standards of Care (CSC); 2) inaccessible COVID-19 testing programs; and 3) hospital visitor policies which deprived individuals with disabilities of reasonable accommodations necessary to make informed decisions about, and actively participate in, their own care and treatment.

The **Coelho Center for Disability Law, Policy and Innovation** at Loyola Marymount University was founded in 2018 by the Honorable Anthony Coelho, former congressman and original sponsor of the Americans with Disabilities Act. Through research, convenings, policy-work, and leadership programs, the Center works to protect the rights of people with disabilities. The Center's guiding principles include (1) attending to the multiply marginalized in our community, and (2) representing disabled individuals who experience higher levels of discrimination by institutions and their representatives based on fear, bias, and unwillingness to meet disability related access needs.

**Deaf Equality** is a non-profit legal services organization committed to achieving true equality for Deaf, DeafBlind, DeafDisabled, Hard of Hearing, and

Late Deafened (collectively, "Deaf and Hard of Hearing") individuals across the United States and worldwide.  As an organization led by and for Deaf and Hard of Hearing individuals, Deaf Equality offers unique expertise and first-hand knowledge of the lived experience of these communities.  Despite the apparent advances made under federal laws protecting the rights of people with disabilities, such as the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., members of our communities continue to face pervasive discrimination and barriers in many aspects of daily life.  Through a comprehensive approach that includes advocacy, litigation, policy development, consulting, and education, Deaf Equality strives to challenge and dismantle oppressive attitudes and systemic discrimination. Such efforts are intended to ensure that all Deaf and Hard of Hearing individuals have full, equitable access to every aspect of society including in areas such as healthcare, mental health, education, employment, technology, telecommunications, and the justice and legal systems.

**Disability Law United (DLU)** is a national nonprofit organization whose mission is to defend human and civil rights secured by law, focusing on intersectional disability justice. DLU's efforts to defend human and civil rights extend to all walks of life, including ensuring that individuals with disabilities can access all advantages, privileges, benefits, and health programs and activities

offered by public and private entities in the United States. People with disabilities face structural barriers as well as conscious and unconscious bias when seeking and receiving healthcare. DLU litigates to tear down those barriers and address those biases to ensure that people with disabilities do not continue to suffer such discrimination.

**Disability Rights Advocates (DRA)** is based in Berkeley, California, with offices in New York City, New York and Chicago, Illinois. DRA is a national nonprofit public interest legal center recognized for its expertise on issues affecting people with disabilities. DRA is dedicated to ensuring dignity, equality, and opportunity for people with all types of disabilities, and to securing and protecting their civil rights. To accomplish those aims, DRA represents clients with disabilities who face discrimination or other violations of federal or state civil rights or federal constitutional protections in complex, system-changing class action and impact litigation. DRA takes on precedent-setting disability rights class actions across the nation, including in the context of healthcare access.

**Disability Rights Education and Defense Fund** (DREDF) based in Berkeley, California, is a national law and policy center dedicated to protecting and advancing the civil rights of people with disabilities. Founded in 1979, DREDF pursues its mission through education, advocacy, and law reform efforts, and is nationally recognized for its expertise in the interpretation of federal

disability civil rights laws. DREDF advocates for policies and civil rights enforcement to dismantle ableism in healthcare and to advance health equity across disability, race, and ethnicity.

**Disability Rights Legal Center (DRLC)** is a non-profit legal organization that was founded in 1975 to represent and serve people with disabilities. Individuals with disabilities continue to struggle with ignorance, prejudice, insensitivity, and lack of legal protections in their endeavors to achieve fundamental dignity and respect. DRLC assists people with disabilities in obtaining the benefits, protections, and equal opportunities guaranteed to them under the Rehabilitation Act of 1973, the Americans with Disabilities Act, the Unruh Civil Rights Act, and other state and federal laws. DRLC's mission is to champion the rights of people with disabilities through education, advocacy and litigation. DRLC is a leading disability public interest organization which participates in amici curiae efforts to ensure protection of and respect for the rights of people with disabilities.

**Disability Rights Mississippi ("DRMS")** is the federally mandated Protection and Advocacy ("P&A") system for individuals with disabilities in the state of Mississippi. DRMS is charged with protecting the legal, civil, and human rights of people with disabilities across all settings, including healthcare facilities. As a statewide nonprofit legal advocacy organization, DRMS provides legal

representation, investigates abuse and neglect, and engages in systemic litigation to combat discrimination against people with disabilities.

- DRMS joins this amicus brief to underscore the devastating impact of medical discrimination on people with disabilities—especially those who are multiply marginalized due to race, poverty, or other intersecting identities. DRMS has seen firsthand how medical decisions informed by discriminatory views of a person's "quality of life" too often result in denial of care, premature death, and the erosion of basic human dignity. The decision below, if left to stand, would render key federal protections under Section 504 of the Rehabilitation Act and Section 1557 of the Affordable Care Act effectively meaningless in medical settings. It would grant providers impunity to act on biases against disabled patients—so long as their discrimination is dressed up in the language of clinical judgment.

- DRMS urges this Court to reaffirm that people with disabilities are entitled to the full protection of civil rights laws in medical settings, and that disability discrimination is not erased simply because it occurs in the context of a treatment decision. The right to access care free from discrimination is not only fundamental—it is often a matter of life and death.

**Disability Rights Washington (DRW)** is the nonprofit statewide protection and advocacy system designated by the governor of the state of Washington to protect and advocate for the rights of Washington State residents with disabilities. DRW advocates for individuals who have faced disability discrimination, including in medical settings. DRW believes people with disabilities have a right to not be discriminated against due to their disability when accessing medical care and that the Rehabilitation Act provides important civil rights protections. Because Black disabled people are more likely to face bias and unfair medical treatment due to their disability and race, making medical malpractice claims not subject to the Rehabilitation Act ignores the civil rights violations and strips disabled patients and of an established remedy under disability rights laws.

**Institute for Patients' Rights ("IPR")** is a national, 501(c)(3) organization that conducts and supports research and public education on healthcare disparities in the context of end-of-life issues. IPR advocates to protect individuals' rights in numerous healthcare contexts, including by providing information about the discriminatory effects of physician-assisted suicide laws and the dangers those laws pose to vulnerable individuals; opposing discriminatory crisis standards of care put in place during the COVID-19 pandemic that placed people with disabilities at risk of harm; advocating against the use of the QALY metric, which discriminates against and diminishes the value of the lives of people with

disabilities; educating the public about disparities in healthcare access and outcomes, including those based on race, age, and/or disability; and advocating for improvements to the quality of hospice and palliative care services, as well as for expanded access to these key services.

**National Council on Independent Living:** The National Council on Independent Living (NCIL) is the longest-running national cross-disability, grassroots organization run by and for people with disabilities. NCIL works to advance independent living and the rights of people with disabilities. NCIL's members include individuals with disabilities, Centers for Independent Living, Statewide Independent Living Councils, and other disability rights advocacy organizations.

**New Disabled South** is a regional non-profit organization that is dedicated to improving the lives of disabled individuals and cultivating strong disability rights and disability justice frameworks in the South. The legal issues presented in this case are of interest to New Disabled South because the historic and current harms of disability discrimination negatively impact our community and we support the enforcement of disability rights protections under Section 504 of the Rehabilitation Act and Section 1557 of the Affordable Care Act.

**Not Dead Yet** is a national grassroots disability rights organization that opposes legalization of assisted suicide and euthanasia as deadly forms of

discrimination, and the non-voluntary withdrawal or withholding of life-sustaining medical treatment, including but not limited to, futility policies involving health care provider decisions to withhold or withdraw life-sustaining medical treatment.

- o Not Dead Yet provides information and referral services, including legal referrals, to individuals who face discrimination in the provision of life-sustaining medical care as well as to people who are being denied lifesaving medical treatment. Not Dead Yet's constituents are qualified individuals with disabilities within the meaning of Title II of the ADA, Section 504, and Section 1557 of the ACA. Not Dead Yet's constituents include chronic ventilator users.

- o Staff and board members of Not Dead Yet regularly give presentations to disability rights groups, people with disabilities, and their families, on a variety of topics related to disability discrimination and the provision of healthcare services, including assisted suicide, the withholding of medical treatment, the effects of these policies on people with disabilities, and health care disparities based on race. Not Dead Yet has filed amicus briefs in numerous court cases on these issues, including a brief in the Texas Supreme Court case of Miller v. HCA

**TASH** is a national organization founded in 1975 advocating for human rights and inclusion for people with significant disabilities and support needs. TASH works to advance inclusive education practices through advocacy, research, professional development, policy, and information and resources for parents, families and self-advocates. The inclusive practices TASH validates through research have been shown to improve outcomes for all people.

**The National Association of the Deaf (NAD)**, founded in 1880 by deaf and hard of hearing leaders, is the oldest national civil rights organization in the United States. As a non-profit serving all within the USA, the NAD has as its mission to preserve, protect,and promote the civil, human, and linguistic rights of more than 48 million deaf and hard of hearing people in this country. The NAD is supported by affiliated state organizations in 48 states and D.C. as well as affiliated nonprofits serving various demographics within the deaf and hard of hearing community. Led by deaf and hard of hearing people on its Board and staff leadership, the NAD is dedicated to ensuring equal access in every aspect of life including, but not limited to, healthcare and mental health services, education, employment, entertainment, personal autonomy, voting rights, access to professional services, legal and court access, technology, and telecommunications.

**The National Federation of the Blind** ("NFB"), the oldest and largest national organization of blind persons, is a non-profit corporation headquartered in

Baltimore, Maryland. It has affiliates in all 50 states, Washington, D.C., and Puerto Rico. It has over 50,000 members nationwide. The NFB and its affiliates are recognized by the public, Congress, executive agencies of state and federal governments, and the courts as a collective and representative voice on behalf of blind Americans and their families. The ultimate purpose of the NFB is the complete integration of the blind into society on a basis of equality. This objective includes the removal of legal, economic, and social barriers to access. As part of its mission and to achieve these goals, the NFB has worked actively to ensure that the blind have equal access to healthcare services and programs.

**The National Health Law Program (NHeLP),** founded in 1969, protects and advances health rights of low-income and underserved individuals and families, including people with disabilities. NHeLP advocates, educates, and litigates at the federal and state levels to advance health and civil rights in the U.S. NHeLP has participated in many cases to enforce the rights of people with disabilities to be free from discrimination under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Section 1557 of the Affordable Care Act, and other laws. NHeLP also serves as a legal backup center for attorneys and advocates across the country representing people with disabilities. NHeLP is not a subsidiary of any other corporation and no publicly held corporation owns 10 percent or more of any of NHeLP's stock.

Founded in 1972, the **National Women's Law Center (NWLC)** is a non-profit legal advocacy organization that fights for gender justice in the courts, in public policy, and in our society. NWLC has long advocated for protections against discrimination in healthcare, including protections against sex discrimination as well as protections against race, disability, and age discrimination, which can cause compounding harms to people who face multiple forms of discrimination.

Founded by paralyzed veterans in 1946, **United Spinal Association** is a national 501(c) (3) nonprofit membership organization dedicated to empowering people with spinal cord injuries and disorders (SCI/D), such as multiple sclerosis, amyotrophic lateral sclerosis (ALS), and spina bifida, including veterans, and to advancing their independence and quality of life in order to live successful and fulfilling lives. Directed by people with disabilities, United Spinal Association works to overcome the stigma of disability and remove physical barriers from society to include all wheelchair users. Their goal is to actively support people with SCI/D through valuable programs and services that maximize independence and create opportunities to become leaders, advocates, and innovators.

**World Institute on Disability** is an internationally recognized public policy center organized by and for people with disabilities, which works to strengthen the disability movement through research, training, advocacy, and public education so

that people with disabilities throughout the world enjoy increased opportunities to live independently.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed via the Court's electronic filing system on April 7, 2025, to be served by operation of the electronic filing system on all ECF-registered counsel of record.

/s/                         

Claudia Center*
Jinny Kim
Erin Neff
Disability Rights Education & Defense Fund
3075 Adeline Street, Suite 210
Berkeley, CA 94703
Ph: 510-644-2555
ccenter@dredf.org

*Counsel of Record for Amici Curiae

# CERTIFICATE OF COMPLIANCE

## TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the word limitation of Fed, R, App, P, 29(a)(5) because this brief contains 6,500 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Word in 14-point font size, Times New Roman.

/s/ _____

Claudia Center*
Disability Rights Education & Defense Fund
3075 Adeline Street Suite 210
Berkeley, CA 94703
Ph: 510-644-2555
ccenter@dredf.org

*Counsel of Record for Amici Curiae